Filed 8/5/14  P. v. Campbell CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>ERIC GREGORY CAMPBELL,<br><br>        Defendant and Appellant. | D063806<br><br><br><br>(Super. Ct. No. SCN313019) |

APPEAL from a judgment of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael T. Murphy and Lise S. Jacobson, Deputy Attorneys General for Plaintiff and Respondent.

INTRODUCTION

A jury found Eric Gregory Campbell guilty of one count of felony resisting an executive officer (Pen. Code, § 69)[1] and one count of misdemeanor resisting an officer (§ 148, subd. (a)(1)). At the sentencing hearing, the trial court denied Campbell's oral motion under section 17, subdivision (b) (17(b) motion) to reduce the felony conviction to a misdemeanor. The court then suspended imposition of sentence and placed Campbell on three years of formal probation for the felony conviction and three years of summary probation for the misdemeanor conviction.

Campbell appeals, contending: (1) there was insufficient evidence to convict him of the felony charge; (2) the court prejudicially erred by failing to sua sponte instruct the jury on what constitutes a lawful detention and arrest; and (3) the court abused its discretion by denying his 17(b) motion. We conclude there was sufficient evidence to support the jury's verdict, any instructional error was harmless, and the court acted within its broad discretion to deny the 17(b) motion. We, therefore, affirm the judgment.

BACKGROUND

*Prosecution Evidence*

San Diego County Sheriff's Deputy Frank Leyva responded to a call about a house party with more than 200 teenagers and underage adults drinking and smoking. Deputy Leyva and other deputies briefly staged nearby and then drove to the house. Parked cars lined the entire street. Deputy Leyva stopped in front of the house, got out of his patrol

---

[1] Further statutory references are also to the Penal Code unless otherwise stated.

2

car, and approached the house. He heard kids yelling, screaming, and partying in the backyard. He flashed his flashlight in the backyard and the partygoers scattered. As they scattered, some of them remarked, "F—k you[]. F—k the cops."

About 20 to 30 minutes later, the partygoers began leaving in mass while continually calling out, "F—k you. F—k you pigs." Deputy Leyva started directing traffic in front of the house. While he was doing so, a young man shouted from the driveway, "F—k you, f—k the cops." Leyva approached the young man, who ran into the backyard. Deputies Leyva and Dylan Haddad followed him. There they saw Campbell yelling at Deputy Jessica Charles. Charles asked Campbell if he was the homeowner because he appeared to be the oldest person at the party. She also asked him why he was the only adult at a high school party. Campbell responded, "You are a c—t." She told him he was "being worthless" and walked away with a man she had previously detained for throwing a beer bottle at her feet and saying, "F you. Get away from me. It's my f'in house."

Deputy Haddad approached Campbell after hearing his remark to Deputy Charles. Campbell said, "F—k you, pigs. Go get a donut." Campbell's eyes were bloodshot, his speech was slurred, and Haddad could smell alcohol on him from five feet away. Campbell turned and walked into his basement apartment, slamming the door shut behind him. He yelled something like, "F—k you guys. Kick the door in. You already gave me a $500 ticket."

Deputy Leyva resumed directing traffic in front of the house. A short while later, a car drove up. Leyva stopped the car about 25 yards from the house. The driver said she was Campbell's girlfriend and was going to Campbell's home. About then, Campbell, who was six feet tall and weighed about 180 pounds, jogged toward Leyva, yelling and screaming, "F—k you. That's my f—king girlfriend. She will park wherever the f—k she wants." Leyva could smell alcohol on Campbell.

Campbell pointed his right hand at Deputy Leyva who could see something white in it, but did not know what the object was and did not know whether Campbell was armed. Leyva commanded Campbell to stop three times. Campbell did not acknowledge or comply with these commands. Instead, he continued to yell statements like, "[F]—k you, f—k off, that's my f—king girlfriend. She can park wherever the f—k she wants. Let her go. She hasn't done anything."

Deputy Leyva thought he would have to move to avoid being trampled, but Campbell slowed to a walk as he neared Leyva. Intending to detain Campbell for failing to listen to him and to get him out of the street, Leyva reached for Campbell's raised hand and told him to put his hands behind his back. However, before Leyva could get a solid grip on Campbell's hand, Campbell pulled away. Leyva did not know whether Campbell would try to strike, punch or tackle him. Leyva stepped aside, grabbed Campbell's shirt or arm, and pushed Campbell forward. Campbell ended up on the hood of his girlfriend's car. Leyva told Campbell to put his hands behind his back. When Campbell did not

4

comply, Leyva reached for Campbell's right wrist. As Leyva did so, Campbell tucked his arms underneath himself trapping Leyva's right hand in the process.

Deputy Leyva felt vulnerable because he did not know Campbell or his girlfriend and his girlfriend's car was running. Leyva grabbed Campbell with his left hand, pulled Campbell off the hood, and tossed him into the street. Their feet became entangled and Leyva, who was 5 feet 10 inches tall and weighed approximately 275 pounds with his vest, belt, and other equipment on, fell on top of Campbell on the asphalt. Leyva's right hand remained trapped underneath Campbell. Although Leyva was eventually able to free his right hand, Campbell continued to ignore Leyva's verbal commands to stop resisting and to put his arms behind his back.

Deputy Haddad saw Deputy Leyva struggling with Campbell and ran to assist. Campbell was lying face down with his hands under his body, swinging his arms in a forceful manner and thrashing his body. Haddad, who was 5 feet 6 inches tall and weighed about 160 pounds, kneeled on Campbell's left side and delivered two knee strikes. Campbell continued moving his head from left to right and attempted to stand up. Haddad pushed him back to the ground. Campbell ignored the deputies' commands to stop resisting and show his hands, and they still did not know then whether he had any weapons.

At some point, Deputy Leyva punched Campbell in the shoulder and was able to get Campbell's left hand behind his back. Leyva removed an object from Campbell's hand and tossed it to the side. A third deputy struck Campbell's shoulder blade with a flashlight to get Campbell to move his right hand from under his stomach to behind his

5

back. When the flashlight strikes were unsuccessful, the deputy stunned Campbell with an electroshock weapon.

After the deputies handcuffed Campbell and rolled him over, Leyva noticed Campbell's forehead was bleeding. Deputies Leyva and Haddad walked Campbell to the patrol car and, when they reached it, Campbell tensed up, pushed off the back of the car, and slammed his body into Haddad. Haddad gave Campbell's left thigh two knee strikes and Campbell got into the car.

Deputy Haddad drove Campbell to the hospital, where hospital staff used staples to close an approximately one-inch laceration on Campbell's forehead. Leyva only sustained a minor cut on one of his fingers. Leyva described Campbell's level of resistance that night as an eight on a scale of one to ten, with ten being the highest.

A neighbor saw Campbell handcuffed in the driveway, heard the deputies repeatedly ask him to stay on the ground, and saw him repeatedly trying to get up. The neighbor also heard Campbell yelling for his girlfriend to "videotape this." Nothing about the deputies' behavior caused the neighbor to want to complain about them.

The teenage party hostess saw Campbell running toward his girlfriend's car with a red camcorder and throw it in the car. The hostess did not see overly forceful conduct by the deputies toward the partygoers.

When Campbell returned home the next day, he told the hostess he was going to sue her and her parents and asked her to pay his bail. He also asked her to provide a statement and to find three friends who would write statements indicating the deputies attacked him and he did not assault a deputy. He told her it would be better if her friends

6

did not know him, it did not matter whether they attended the party, and they would not have to testify in court.

A sheriff's lieutenant testified as an expert in the use of force. He explained what the phrase "use of force" meant and some of the force options available to deputies, depending on the circumstances. In response to hypothetical questions mirroring the facts of this case, he opined the deputies' escalating use of force was reasonable.

*Defense Evidence*

Campbell testified he spoke with two deputies at the party and told them he lived at the home. When one of the deputies commented he looked too old for the party, he responded he was not part of the party and went back to his apartment, which was on the lower level in the rear of the house. As he was entering the apartment, he encountered Deputy Leyva, who asked him who he was and what he was doing. He ignored Leyva because he had already spoken with another deputy and did not feel he could be of further assistance. After entering his apartment, he shut, not slammed, the door behind him. He then talked on the phone with his girlfriend.

When his girlfriend told him she was coming up the street, he told her he would meet her. He walked to a neighbor's driveway and saw her in her car answering Deputy Leyva's questions. Because her English was not "real good," he put his hand up, pointed to the car, and said, "Officer, that's my girlfriend." "Can I help her park her car?" Leyva asked him, "Who are you?" Campbell replied, "I'm the guy who lives down in the back of the house." Leyva responded, "Oh. Come out here. I can't see you."

7

Campbell walked toward his girlfriend's car. Campbell did not have anything in his hands. He met Deputy Leyva in front of the car and Leyva grabbed his right wrist, twisted him around, and pushed him onto the hood. He asked Leyva, "Why are you doing this to me? I didn't do anything wrong?" As Leyva elbowed Campbell in the back and started handcuffing Campbell, Leyva responded, "I'll teach you to slam the door in my face." Campbell denied spitting, swearing or trying to kick Leyva, but acknowledged he probably squirmed to readjust the handcuffs.

Deputy Leyva moved Campbell from the hood of the car to the ground. Leyva then sat on Campbell, and hit Campbell's back and shoulders with his fist. Leyva or a second officer hit Campbell's head and shoulders with a flashlight. Then, Campbell received 15 seconds of electric shock to his side. Campbell screamed, "I'm still," four times before the deputies stopped. He felt like he had almost been killed.

Two of the deputies picked him up and carried him to a patrol car because he could not stand up. When they got to the car, they hit his knees a few times and then threw him into the back of it.

Campbell said he had had a couple of beers that evening, but he was not drunk. He denied asking the teenage party hostess to find people to fabricate statements, but he admitted asking her for bail money. He believed she was responsible for what had happened to him because she hosted the party.

Campbell's girlfriend also testified and essentially corroborated Campbell's version of events. She estimated the deputies hit Campbell between 25 and 30 times. She did not see Campbell spit at, punch, hit, or kick the deputies at any time.

8

DISCUSSION

I

*Sufficiency of Evidence Claim*

Campbell contends there is insufficient evidence to support his conviction for violating section 69.  In evaluating Campbell's claim, " 'we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]  . . . A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' "  (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

Section 69 provides:  "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, is punishable by [fine, imprisonment, or both]."  "The statute sets forth two separate ways in which an offense can be committed.  The first is attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law; the second is resisting by force or violence an officer in the performance

9

of his or her duty."  (*In re Manuel G.* (1997) 16 Cal. 4th 805, 814; accord, *People v. Smith* (2013) 57 Cal.4th 232, 240.)  Both parties agree the jury convicted Campbell under the second theory.

A conviction under the second theory requires proof "the defendant resist[ed] the officer 'by the use of force or violence' " and "that the officer was acting lawfully at the time of the offense."  (*People v. Smith*, *supra*, 57 Cal.4th at p. 241; see CALCRIM No. 2652.)  Campbell contends there was insufficient evidence to establish either of these elements.  Rather, the evidence shows the deputies used excessive force against him.

However, the evidence, viewed in the light most favorable to the judgment, showed Deputy Leyva and the other deputies went to the home where Campbell was living to break up an out-of-control party.  While Leyva was attempting to direct traffic, which Campbell does not dispute was a lawful duty, Campbell jogged toward him shouting expletives.  Campbell carried an unknown object in his right hand, which he had pointed at Leyva, and he ignored Leyva's repeated commands to stop.  When Campbell neared Leyva, Leyva attempted to detain Campbell and commanded Campbell to put his hands behind his back.  Instead of complying with Leyva's command, Campbell put his hands underneath his torso and trapped one of Deputy Leyva's hands on the hood of a running vehicle.  Campbell thrashed about and continued resisting Leyva's commands despite receiving fist strikes, flashlight strikes, and knee strikes.  He did not initially stop resisting until a deputy administered electric shocks.  He then resumed resisting when deputies tried to place him in a patrol car until he received two knee strikes.  Collectively, this evidence supports his conviction for violating section 69.  (See *People v. Bernal*

10

(2013) 222 Cal.App.4th 512, 518-519; *People v. Carrasco* (2008) 163 Cal.App.4th 978, 985-986.)

The existence of conflicting evidence favorable to Campbell does not alter our conclusion. " ' "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." ' " (*People v. Manibusan*, *supra*, 58 Cal.4th at p. 87.) As there is substantial evidence to support Campbell's felony conviction in the record before us, we conclude he has not established the conviction should be reversed on this ground.

II

*Instructional Error Claim*

A

Using CALCRIM No. 2652, the court instructed the jury the felony crime of resisting an executive officer required proof that "[w]hen the defendant acted, the officer was performing his lawful duty." In addition, the court instructed the jury, "[t]he duties of a peace officer include responding to dispatch calls regarding noise complaints, crowd control, and keeping the peace." The court further instructed the jury, "A peace officer is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone or using unreasonable or excessive force in his or her duties. [CALCRIM No.] 2670 explains when an arrest or detention is unlawful and when force is unreasonable or

11

excessive."  The court provided substantially similar instructions on the misdemeanor crime of resisting an officer using CALCRIM No. 2656.

Using an adapted version of CALCRIM No. 2670, the court instructed the jury, "The People have the burden of proving beyond a reasonable doubt that Leyva [and the other deputies] were lawfully performing their duties as peace officers.  If the People have not met this burden, you must find the defendant not guilty of Resisting an Executive Officer or Resisting a Peace Officer.

"A peace officer is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone or using unreasonable or excessive force when making or attempting to make an otherwise lawful arrest or detention.

"Special rules control the use of force.

"A peace officer may use reasonable force to arrest or detain someone, to prevent escape, to overcome resistance, or in self defense.

"If a person knows, or reasonably should know, that a peace officer is arresting or detaining him or her, the person must not use force or any weapon to resist an officer's use of reasonable force.  However, you may not find the defendant guilty of resisting arrest if the arrest was unlawful, even if the defendant knew or reasonably should have known that the officer was arresting him.

"If a peace officer uses unreasonable or excessive force while arresting or attempting to arrest or detaining or attempting to detain a person, that person may lawfully use reasonable force to defend himself or herself.

12

"A person being arrested uses reasonable force when he or she: (1) uses that degree of force that he or she actually believes is reasonably necessary to protect himself or herself from the officer's use of unreasonable or excessive force; and (2) uses no more force than a reasonable person in the same situation would believe is necessary for his or her protection."

The court's adaptation of CALCRIM No. 2670 omitted two sections. The first section, section A, states: "A peace officer may legally detain someone if [the person consents to the detention or if]: [¶] 1. Specific facts known or apparent to the officer lead him or her to suspect that the person to be detained has been, is, or is about to be involved in activity relating to crime; [¶] AND [¶] 2. A reasonable officer who knew the same facts would have the same suspicion. [¶] Any other detention is unlawful. [¶] In deciding whether the detention was lawful, consider evidence of the officer's training and experience and all the circumstances known by the officer when he or she detained the person." (CALCRIM No. 2670.)

The second section, section B, states in part: "A peace officer may legally arrest someone [either] (on the basis of an arrest warrant/ [or] if he or she has probable cause to make the arrest). [¶] Any other arrest is unlawful. [¶] Probable cause exists when the facts known to the arresting officer at the time of the arrest would persuade someone of reasonable caution that the person to be arrested has committed a crime. [¶] In deciding whether the arrest was lawful, consider evidence of the officer's training and experience and all the circumstances known by the officer when he or she arrested the person." (CALCRIM No. 2670.)

13

The bench notes for CALCRIM No. 2670 state a court should include section A in its jury instructions "if there is an issue as to whether the officer had a legal basis to detain someone." The bench notes state a court should give section B "if there is an issue as to whether the officer had a legal basis to arrest someone." (Bench Notes to CALCRIM No. 2670.)

B

Although neither party specifically requested the court to instruct the jury with sections A and B of CALCRIM No. 2670, Campbell contends on appeal the court prejudicially erred by failing to do so sua sponte.

" 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' " (*People v. Smith*, *supra*, 57 Cal.4th at p. 239.)

While there were allusions during the trial to Deputy Leyva's actions possibly amounting to an unlawful detention and/or arrest, the indisputable focus of the trial was on whether Deputy Leyva and the other deputies used excessive force against Campbell. Assuming, without deciding, the court should have nonetheless instructed the jury with the sections of CALCRIM No. 2670 addressing unlawful detention and arrest, we conclude any error was harmless under both the state miscarriage of justice standard

14

(*People v. Watson* (1956) 46 Cal.2d 818, 836-837) and the federal harmless beyond a reasonable doubt standard (*Chapman v. California* (1967) 386 U.S. 18, 24).

The jury knew from the instructions given it had to find Campbell not guilty if Deputy Leyva had unlawfully detained or arrested Campbell. Although the court did not elaborate on what constituted an unlawful detention or arrest, the parties' presentation of diametrically opposing versions of events precluded the jury from finding for Campbell under either theory unless the jury credited Campbell's version of events. The jury necessarily rejected Campbell's version of events when the jury rejected the theory the deputies acted with excessive force. Accordingly, we conclude both that it is not reasonably probable Campbell would have obtained a more favorable result absent the claimed error and that the record establishes beyond a reasonable doubt the claimed error did not contribute to the guilty verdict. (See *People v. Flood* (1998) 18 Cal.4th 470, 505.)

## III

### *Denial of 17(b) Motion Claim*

### A

At the sentencing hearing, Campbell orally brought a 17(b) motion to reduce his felony conviction to a misdemeanor. He argued the nature and circumstances of the offense, his age, his lack of a prior criminal record, his work history, and his remorse justified the reduction.

The court denied the 17 (b) motion, finding Campbell's conduct did not warrant reducing the conviction to a misdemeanor. In reaching its decision, the court explained,

15

"In this case, the defendant took the stand.  The jury found he was lying not only to them but to the court.  [¶]  He paraded his girlfriend up here to lie for him as well.  [¶]  The court heard testimony from his 17-year old neighbor that indicated he attempted to elicit false testimony through her and her friends as well.  [¶]  So whatever the conduct that defendant did on that day, whether that was misdemeanor or felony, it needs to be viewed in the prism of his conduct after that as well.  His conduct after that as well tells this court that he needs to be on felony probation.  [¶] . . . [¶]  . . .  I do think that a message needs to be sent to him that he does need to take actual responsibility and have some actual remorse.  [¶]  What I have heard from him so far I don't characterize as actual responsibility or remorse.  [¶]  His comments to the probation officer are not taking the responsibility.  His comments from the witness stand are not taking responsibility.  His comments from counsel table today are not taking [responsibility].  [¶]  He apologizes for wasting the court's time, never apologizes for putting Deputy Leyva in the situation where he feared for [his] life and safety and, had the defendant merely listened to the verbal commands, would not have needed to be done."

B

Campbell contends the court abused its discretion by denying his 17(b) motion. We disagree.

A violation of section 69 is a "wobbler" offense in that a court has the discretion to sentence the crime as either a felony or a misdemeanor.  (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 974.)  A court had broad discretion under section 17, subdivision (b), in deciding whether to reduce a wobbler offense to a misdemeanor.

16

(*People v. Superior Court* (*Alvarez*), *supra*, at p. 977.)  We will not disturb the court's decision on appeal unless the party challenging the decision clearly shows the decision was irrational or arbitrary.  (*Ibid*.)  Absent such a showing, we presume the court acted to achieve legitimate sentencing objectives.  (*Id.* at pp. 977-978.)

Here, the court considered Campbell's motion and determined it was not appropriate to reduce Campbell's conviction at that time because his conduct was dangerous and avoidable, he and his girlfriend lied about his conduct at trial, and he did not accept responsibility or exhibit remorse for his conduct.  Nothing about the court's stated reasons for denying Campbell's motion indicates the court's decision was irrational or arbitrary.  Accordingly, we conclude Campbell has not established the court abused its discretion in denying his motion.

## DISPOSITION

The judgment is affirmed.


McCONNELL, P. J.

WE CONCUR:


NARES, J.


AARON, J.

17